# U.S. TRUST

**Deborah L. Scesney**
Vice President
Private Banking

March 3, 2005

Mr. and Mrs. Michael DeFelice
4 Riverview Terrace
New York, NY 10022

Dear Babette and Michael:

We are pleased to offer you a loan with the following terms and conditions:

**BORROWERS:**    Michael V. DeFelice
Babette DeFelice

**AMOUNT:**    $630,000.00

**PURPOSE:**    Personal investments.

**COLLATERAL:**    First mortgage on land located at 505 W. Saddle Butte Way, Jackson, WY.

**TERM:**    5 years

**PAYMENTS:**

1. Repayment will be made over a 5 year term payable in monthly installments of interest. A balloon payment of all principal will be due at maturity.

2. The first regular payment will be due on the first day of the second calendar month after closing. Payments will be due on the first day of each month thereafter. A payment consisting of interest only from the date of closing to the end of the calendar month of the closing will be paid at the closing. All loan payments will be automatically charged to your deposit account by UST Mortgage Company.

**INTEREST RATE:**

1. The initial interest rate on your loan will be set seven business days prior to closing and will be adjusted annually based on the One Year London Interbank Offered Rate (LIBOR) as published in *The Wall Street Journal, Eastern Edition*, + 1.50% per annum.

2. Interest will be computed on the basis of a 30-day month and a 360-day year.

UNITED STATES TRUST COMPANY OF NEW YORK
11 West 54th Street  New York  NY 10019-5484
Telephone 212 887 0468

**Exhibit A**    1

3. If we are not able to automatically charge an account at U. S. Trust for the periodic payments of principal and interest on this loan, your rate will be 10 basis points higher than the interest rate quoted above.

**ASSUMABILITY:**    This loan is not assumable.

**PREPAYMENT CHARGE:**    There will be no prepayment charge.

**LATE PAYMENTS:**    Any payment received more than fifteen days after the payment is due will be subject to a late fee equal to 2% of the amount of the payment.

**OTHER CONDITIONS:**

1. Our offer of this loan is subject to (a) our receipt of an appraisal acceptable to us (we will order the appraisal and will charge your account for the appraisal fee) showing a valuation of at least $1,050,000.00 and (b) our attorney's review of all matters of title and documentation.  We do require that the title company issuing your policy have a Duff & Phelps rating of at least A-.

2. Your closing must take place no later than May 18, 2005, on which date this offer expires.

3. The law firm of Cassin Cassin & Joseph will handle the documentation and closing for U. S. Trust and their expenses, estimated to be $1,250.00, are to be paid by you.

4. In the event there is any material adverse change in your financial condition or income before closing, we retain the option to withdraw this offer.

5. You agree to provide us with a complete financial statement on our form within thirty (30) days of our request.  You shall also provide supplemental financial information as requested.

6. We do not require that you escrow with us for real estate taxes and insurance.

7. We do not require Private Mortgage Insurance as a condition of making the loan.

8.   Flood insurance will be required if the property is in a flood zone.

9.   At closing, your loan will be immediately assigned to our Mortgage Service Company for servicing. However, please be assured that your overall banking relationship will be my responsibility.

Nothing in this letter is intended to amend, modify, limit or restrict any provision of the loan documents. The provisions of the loan documents will be controlling and fully effective regardless of anything in this letter to the contrary.

By signing this letter, you accept this offer to lend and agree to sign the loan documents and to borrow from us pursuant to the terms of this commitment.

Your attorney, either now or at closing, will need to provide various documents to our attorney at Cassin Cassin & Joseph 711 Third Avenue, 20th Floor, New York, NY 10017. Please see the attachment. Your attorney should also contact that firm (212-972-6161) to schedule the loan closing.

Please sign and return the enclosed copy of this letter to me at the above address. The original is for your records. Do not hesitate to call me should you have any questions.

Sincerely,

Enclosures

AGREED AND ACCEPTED:

_____          _____
Michael DeFelice                                                    Date


_____          _____
Babette DeFelice                                                    Date

3

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $630,000.00 | 03-11-2005 | 04-01-2010 | 78000157050 | 11 | 00000062609 | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Michael V. DeFelice
Babette DeFelice
505 W Saddle Butte Way
Jackson, WY 83001

**Lender:** United States Trust Company of New York
Mortgage Lending
114 West 47th Street
New York, NY 10036

**Principal Amount: $630,000.00**          **Initial Rate: 5.030%**          **Date of Note: March 11, 2005**

**PROMISE TO PAY.** To repay my loan, I ("Borrower") jointly and severally promise to pay to United States Trust Company of New York ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Thirty Thousand & 00/100 Dollars ($630,000.00), together with interest on the unpaid principal balance from March 11, 2005, until paid in full.

**PAYMENT.** I will pay this loan in one principal payment of $630,000.00 plus interest on April 1, 2010. This payment due on April 1, 2010, will be for all principal and all accrued interest not yet paid. In addition, I will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning May 1, 2005, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Interest on this Note is computed on a 30/360 simple interest basis; that is, with the exception of odd days in the first payment period, monthly interest is calculated by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by a month of 30 days. Interest for the odd days is calculated on the basis of the actual days to the next full month and a 360-day year. I will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the ONE YEAR LONDON INTERBANK OFFERED RATE (LIBOR) AS PUBLISHED TUESDAY IN THE MONEY RATES SECTION OF THE WALL STREET JOURNAL, EASTERN EDITION, TRUNCATED TO THE THOUSANDTH DECIMAL PLACE. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notice to me. Lender will tell me the current index rate upon my request. The interest rate change will not occur more often than each YEAR. THE INTEREST RATE MAY CHANGE ON THE FIRST DAY OF THE TWELFTH (12TH) OR THIRTEENTH (13TH) MONTH FOLLOWING THE FUNDING DATE OF THE LOAN,** AND ON THAT DAY EVERY TWELVE (12) MONTHS THEREAFTER, THE "CHANGE DATE". THE NEW INTEREST RATE, BASED ON THE INDEX WILL BECOME EFFECTIVE ON EACH CHANGE DATE. THE INDEX WILL BE DETERMINED FIVE (5) CALENDAR DAYS BEFORE EACH CHANGE DATE. (THE "INDEX DETERMINATION DATE"). IF SUCH DAY IS NOT A BUSINESS DAY, THE INDEX WILL BE THE MOST RECENT INDEX FIGURE AVAILABLE PRECEDING THE INDEX DETERMINATION DATE. **THE TWELFTH (12th) month IF the loan funds on a day other than the first of the month, the THIRTEENTH (13th) month if the loan funds on the first. I understand that Lender may make loans based on other rates as well. The Index currently is 3.530% per annum. The interest rate to be applied to the unpaid principal balance of this Note will be at a rate of 1.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.030% per annum. Notwithstanding the foregoing, the variable interest rate or rates provided for in this Note will be subject to the following minimum and maximum rates. NOTICE: Under no circumstances will the interest rate on this Note be less than 1.500% per annum or more than the maximum rate allowed by applicable law. Unless waived by Lender, any increase in the interest rate will increase the amounts of my interest payments.

**PREPAYMENT.** I agree that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be refunded to me upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, I may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve me of my obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due. I agree not to send Lender payments marked "paid in full", "without recourse", or similar language. If I send such a payment, Lender may accept it without losing any of Lender's rights under this Note, and I will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: UST Mortgage Company, Jacksonville, 4601 Touchton Road East Bldg 300, Suite 3220 Jacksonville, FL 32246.

**LATE CHARGE.** If a payment is 16 days or more late, I will be charged 2.000% of the regularly scheduled payment or $10.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the variable interest rate on this Note to 5.500 percentage points over the Index. The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** I will be in default under this Note if any of the following happen:

**Payment Default.** I fail to make any payment when due under this Note.

**Break Other Promises.** I break any promise made to Lender or fail to perform promptly at the time and strictly in the manner provided in this Note or in any agreement related to this Note, or in any other agreement or loan I have with Lender.

**Default in Favor of Third Parties.** I or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of my property or my ability to repay this Note or perform my obligations under this Note or any of the related documents.

**False Statements.** Any representation or statement made or furnished to Lender by me or on my behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished.

**Death or Insolvency.** Any Borrower dies or becomes insolvent; a receiver is appointed for any part of my property; I make an assignment for the benefit of creditors; or any proceeding is commenced either by me or against me under any bankruptcy or insolvency laws.

**Taking of the Property.** Any creditor or governmental agency tries to take any of the property or any other of my property in which Lender has a lien. This includes taking of, garnishing of or levying on my accounts with Lender. However, if I dispute in good faith whether the claim on which the taking of the property is based is valid or reasonable, and if I give Lender written notice of the claim and furnish Lender with monies or a surety bond satisfactory to Lender to satisfy the claim, then this default provision will not apply.

**Defective Collateralization.** This Note or any of the related documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Exhibit B**

## PROMISSORY NOTE
### (Continued)

Loan No: 78000157060

Page 2

**Collateral Damage or Loss.** Any collateral securing this Note is lost, stolen, substantially damaged or destroyed and the loss, theft, substantial damage or destruction is not covered by insurance.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment is curable and if I have not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if I, after receiving written notice from Lender demanding cure of such default: (1) cure the default within twenty (20) days; or (2) if the cure requires more than twenty (20) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then I will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** I agree to pay all costs and expenses Lender incurs to collect this Note. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, I also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and I hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or me against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of New York.

**DISHONORED ITEM FEE.** I will pay a fee to Lender of $10.00 if I make a payment on my loan and the check or preauthorized charge with which I pay is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all my accounts with Lender (whether checking, savings, or some other account and whether evidenced by a certificate of deposit). This includes all accounts I hold jointly with someone else and all accounts I may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. I authorize Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** I acknowledge this Note is secured by the following collateral described in the security instrument listed herein: a Mortgage dated March 11, 2005, to Lender on real property located in Teton County, State of Wyoming. If there is any inconsistency between the terms and conditions of this Note and the terms and conditions of the collateral documents, the terms and conditions of this Note shall prevail.

**FINANCIAL STATEMENTS.** I shall furnish my true and complete financial statment on the Lender's standard form to the Lender within thirty (30) days after a request by the Lender. Also, I shall provide supplemental information immediately upon request by Lender.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon me, and upon my heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. I and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several. This means that the words "I", "me", and "my" mean each and all of the persons signing below.

**PRIOR TO SIGNING THIS NOTE, I, AND EACH OF US, READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. I, AND EACH OF US, AGREE TO THE TERMS OF THE NOTE.**

**I ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

BORROWER:

X_____
Michael V. DeFelice

X_____
Babette DeFelice

**RECORDATION REQUESTED BY:**
    United States Trust Company of New York
    Mortgage Lending
    114 West 47th Street
    New York, NY  10036

**WHEN RECORDED MAIL TO:**
    UST Mortgage Company
    4601 Touchton Road East, Suite 3220
    Jacksonville, FL  32246

**SEND TAX NOTICES TO:**
    Michael V. DeFelice
    505 W Saddle Butte Way
    Jackson, WY  83001

<u>SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY</u>

# MORTGAGE

**MAXIMUM LIEN.  The lien of this Mortgage shall not exceed at any one time $630,000.00.**

**THIS MORTGAGE dated March 11, 2005, is made and executed between Michael V. DeFelice, a married man (referred to below as "Grantor") and United States Trust Company of New York, whose address is 114 West 47th Street, New York, NY  10036 (referred to below as "Lender").**

*(handwritten above "March": as of)*

GRANT OF MORTGAGE.  For valuable consideration, Grantor mortgages and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Teton County, State of Wyoming:**

> **Lot 2 of the Saddle Butte Ranch Subdivision, Teton County, Wyoming, according to that plat recorded January 6, 1998 as Plat No. 920.**

**The Real Property or its address is commonly known as 505 West Saddle Butte Way, Jackson, WY  83001.**

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property.  In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE.  THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S WAIVERS.  Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

GRANTOR'S REPRESENTATIONS AND WARRANTIES.  Grantor warrants that:  (a) this Mortgage is executed at Borrower's request and not at the request of Lender;  (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property;  (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor;  (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

PAYMENT AND PERFORMANCE.  Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

POSSESSION AND MAINTENANCE OF THE PROPERTY.  Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

> Possession and Use.  Until the occurrence of an Event of Default, Grantor may  (1)  remain in possession and control of the Property;  (2) use, operate or manage the Property; and  (3)  collect the Rents from the Property.

> Duty to Maintain.  Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

> Compliance With Environmental Laws.  Grantor represents and warrants to Lender that:  (1)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws.  Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties

**Exhibit C**

contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Wyoming law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $50,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $50,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply

the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

Compliance with Existing Indebtedness. During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes, with the exception of insurance premiums paid by Lender with respect to motor vehicles, but including the payment of attorneys' fees and expenses, will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Promises. All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Borrower's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

Existing Lien. The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

No Modification. Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

Proceedings. If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds. If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

Current Taxes, Fees and Charges. Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

Taxes. The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with

Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** At Lender's option, Grantor will be in default under this Mortgage if any of the following happen:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Break Other Promises.** Borrower or Grantor breaks any promise made to Lender or fails to perform promptly at the time and strictly in the manner provided in this Mortgage or in any agreement related to this Mortgage.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any related document.

**False Statements.** Any representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or Grantor, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Taking of the Property.** Any creditor or governmental agency tries to take any of the Property or any other of Borrower's or Grantor's property in which Lender has a lien. This includes taking of, garnishing of or levying on Borrower's or Grantor's accounts with Lender. However, if Borrower or Grantor disputes in good faith whether the claim on which the taking of the Property is based is valid or reasonable, and if Borrower or Grantor gives Lender written notice of the claim and furnishes Lender with monies or a surety bond satisfactory to Lender to satisfy the claim, then this default provision will not apply.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such Indebtedness, or a default occurs under the instrument securing such Indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity

of, or liability under, any Guaranty of the Indebtedness.  In the event of a death, Lender, at its option, may, but shall not be required to, permit the guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Insecurity.**  Lender in good faith believes itself insecure.

**Right to Cure.**  If any default, other than a default in payments is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default:  (1) cures the default within twenty (20) days; or (2) if the cure requires more than twenty (20) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.**  Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.**  Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.**  With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.**  Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property, including during the pendency of foreclosure, and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness.  In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender.  If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds.  Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed.  Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.**  Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law.  Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount.  Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.**  Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.**  Lender may foreclose Grantor's interest in all or in any part of the Property by non-judicial sale, and specifically by "power of sale" or "advertisement and sale" foreclosure as provided by statute.

**Deficiency Judgment.**  If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.**  If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.**  Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.**  To the extent permitted by applicable law, Borrower and Grantor hereby waives any and all right to have the Property marshalled.  In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales.  Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.**  Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made.  Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.  Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.**  All of Lender's rights and remedies will be cumulative and may be exercised alone or together.  An election by Lender to choose any one remedy will not bar Lender from using any other remedy.  If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.**  If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal.  Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid.  Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law.  Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.**  Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage.  All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage.  Any person may change its address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address.  For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.  Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

## MORTGAGE
## (Continued)

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Property, this Mortgage will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of Wyoming. In all other respects, this Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of New York without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Mortgage is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Note and this Mortgage has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of New York.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor. Grantor further understands that just because Lender consents to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to a request, that does not mean Grantor will not have to get Lender's consent again if the situation happens again.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Wyoming as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means Michael V. DeFelice and Babette DeFelice and includes all co-signers and co-makers signing the Note.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means Michael V. DeFelice.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

It will be Grantor's responsibility to tell the others of the notice from Lender.

**Lender.** The word "Lender" means United States Trust Company of New York, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Note.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated March 11, 2005, **in the original principal amount of $630,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of this Mortgage is April 1, 2010. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____
   Michael V. DeFelice

---

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _____   )
                                            ) SS
COUNTY OF _____   )

On this day before me, the undersigned Notary Public, personally appeared Michael V. DeFelice, to me known to be the individual described in and who executed the Mortgage, and acknowledged that he or she signed the Mortgage as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _____ day of _____, 20_____.

By_____     Residing at_____

Notary Public in and for the State of _____     My commission expires _____

# LAND APPRAISAL REPORT

File No. J0223-I  Page #2
Defelice
File No. J0223-I

**IDENTIFICATION**

Borrower Defelice, Michael | Census Tract 9943 | Map Reference Teton
Property Address 505 W Saddle Butte Way
City Jackson | County Teton | State Wy | Zip Code 83001
Legal Description Lot 2, Saddle Butte Ranch Subdivision N
Sale Price $ ___ Date of Sale N/A | Loan Term N/A yrs. | Property Rights Appraised ☒ Fee ☐ Leasehold ☐ De Minmis PUD
Actual Real Estate Taxes $ 1,831.52 (yr) | Loan charges to be paid by seller $ N/A | Other sales concessions None Reported
Lender/Client U.S. Trust | Address 6065 Parkland Blvd Mayfield Hts, Ohio 44124
Occupant Vacant | Appraiser Kevin B Weed/Resort Appraisal | Instructions to Appraiser Estimate of Value

**NEIGHBORHOOD**

| Location | ☐ Urban | ☒ Suburban | ☐ Rural | | Good | Avg. | Fair | Poor |
|---|---|---|---|---|---|---|---|---|
| Built Up | ☐ Over 75% | ☒ 25% to 75% | ☐ Under 25% | Employment Stability | | ☒ | | |
| Growth Rate | ☐ Fully Dev. ☐ Rapid | ☒ Steady | ☐ Slow | Convenience to Employment | | ☒ | | |
| Property Values | ☐ Increasing | ☒ Stable | ☐ Declining | Convenience to Shopping | | ☒ | | |
| Demand/Supply | ☐ Shortage | ☒ In Balance | ☐ Oversupply | Convenience to Schools | | ☒ | | |
| Marketing Time | ☐ Under 3 Mos. | ☒ 4-6 Mos. | ☐ Over 6 Mos. | Adequacy of Public Transportation | | ☒ | | |
| Present Land Use 50% 1 Family 5% 2-4 Family | % Apts. % Condo % Commercial | | | Recreational Facilities | | ☒ | | |
| % Industrial 45% Vacant % | | | | Adequacy of Utilities | | ☒ | | |
| Change in Present Land Use ☒ Not Likely ☐ Likely (*) ☐ Taking Place (*) | | | | Property Compatibility | | ☒ | | |
| (*) From Vacant To Residential | | | | Protection from Detrimental Conditions | | ☒ | | |
| Predominant Occupancy ☒ Owner ☐ Tenant 0 % Vacant | | | | Police and Fire Protection | | ☒ | | |
| Single Family Price Range $ 500,000 to $ 8 Mil Predominant Value $ 1 Mil + | | | | General Appearance of Properties | | ☒ | | |
| Single Family Age 0 yrs. to 20 yrs. Predominant Age 5 yrs. | | | | Appeal to Market | | ☒ | | |

Comments including those factors, favorable or unfavorable, affecting marketability (e.g. public parks, schools, view, noise): Subject is located in the still developing area west of Jackson. The lots range in size from 5 to 25 acres. The subject has fair access to all consumer services. The subject has year round access.

**SITE**

Dimensions See Attached Plat Map = 16.56 Sq. Ft. or Acres | ☐ Corner Lot
Zoning classification SR Suburban Residential | Present Improvements ☒ do ☐ do not conform to zoning regulations
Highest and best use ☒ Present use ☐ Other (specify)

| | Public | Other (Describe) | OFF SITE IMPROVEMENTS | Topo Slight Slope |
|---|---|---|---|---|
| Elec. | ☒ | | Street Access ☒ Public ☐ Private | Size 16.56 Acres |
| Gas | ☐ | Private | Surface Gravel | Shape Rectangular |
| Water | ☐ | Private | Maintenance ☒ Public ☐ Private | View Mountain and Valley |
| San. Sewer | ☐ | Septic | ☐ Storm Sewer ☐ Curb/Gutter | Drainage Appears Adequate |
| | | Underground Elect. & Tel. | ☐ Sidewalk ☐ Street Lights | Is the property located in a HUD Identified Special Flood Hazard Area? ☒ No ☐ Yes |

Comments (favorable or unfavorable including any apparent adverse easements, encroachments, or other adverse conditions): Standard utility easements. No adverse encroachments or other adverse elements present. Zoning is Single Family.

**MARKET DATA ANALYSIS**

The undersigned has recited three recent sales of properties most similar and proximate to subject and has considered these in the market analysis. The description includes a dollar adjustment reflecting market reaction to those items of significant variation between the subject and comparable properties. If a significant item in the comparable property is superior to or more favorable than the subject property, a minus (-) adjustment is made thus reducing the indicated value of subject; if a significant item in the comparable is inferior to or less favorable than the subject property, a plus (+) adjustment is made thus increasing the indicated value of the subject.

| ITEM | SUBJECT PROPERTY | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 505 W Saddle Butte Way | 550 Phelps Canyon Road | | 22550 Buffalo Valley Road | | 2050 Nowlin Trail North | |
| | Jackson | Jackson | | Moran | | Jackson | |
| Proximity to Subject | | 8.78 miles | | 12.34 miles | | 4.22 miles | |
| Sales Price | $ Refinance | $ 975,000 | | $ 925,000 | | $ 1,562,500 | |
| Price | $ Estimate | $ 975,000 | | $ 925,000 | | $ 1,562,500 | |
| Data Source | Inspection | MLS #B402046/Inspection | | MLS #B302256/Inspection | | MLS #B402083/Inspection | |
| Date of Sale and Time Adjustment | N/A | 10/11/04 | | 10/24/04 | | 11/22/04 | |
| | DESCRIPTION | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust | DESCRIPTION | +(−)$ Adjust |
| Location | Jackson | Jackson-Inf | +97,500 | Moran-Inf | +92,500 | Jackson-Sim | |
| Size/View | Mountains/Valley | Mountains/Teton View-Sup | −97,500 | Mountains/Valley | | Mountains/Teton View-Sup | −156,250 |
| Acreage | 16.56 Acre | 5.19 Acre | +113,700 | 10.00 Acre | +85,800 | 5.15 Acre | +114,100 |
| Utilities | Elec/Well/Septic | Similar | | Similar | | Similar | |
| Hillside | Moderate | Level-Sup | −48,750 | Moderate | | Level-Sup | −78,125 |
| Elk Refuge | None | None | | None | | Yes-Sup | −156,250 |
| Sales or Financing Concessions | None Reported | None Reported | | None Reported | | None Reported | |
| Net Adj. (Total) | | ☒ + − $ 64,950 | | ☒ + − $ 158,100 | | ☐ + ☒ − $ 276,525 | |
| Indicated Value of Subject | | Net 8.7 % $ 1,039,950 | | Net 17.1 % $ 1,083,100 | | Net 17.7 % $ 1,285,975 | |

Comments on Market Data: Market conditions are relatively strong and active, no unusual buydowns, discounts or concessions were noted. Land in this price range is typically on the market for one year or more. Due to a scarcity of comparable sales the search for comparables was expanded to 12 months and given a one mile radius. No public record could be found indicating any sales, options or listings within the past 18 months. No public record could be found indicating the comparable's have resold in the past 12 months.

Comments and Conditions of Appraisal: See addendum for size,view and acreage adjustments. Complete report in summary format. This report is prepared for the sole and exclusive use of the appraiser's client, U.S. Trust. No third parties are authorized to rely upon this report without the express written consent of the appraiser. Comparable one is given the most weight in arriving at a estimated value for the subject.

**RECONCILIATION**

Final Reconciliation: The estimate of value is supported principally by the Sales Comparison Approach. The Cost and Income approaches are not considered relevant to this assignment.

I ESTIMATE THE MARKET VALUE, AS DEFINED, OF SUBJECT PROPERTY AS OF 2/2/05 to be $ 1,050,000

Craig W Smith/Jenson Appraisal Service LLC | Kevin Weed/Resort Appraisal | ☐ Did ☒ Did Not Physically Inspect Property
Appraiser(s) | Review Appraiser (if applicable)

[Y2K]

Bainbridge Appraisal Group
Form LND — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

**Exhibit D**

## LAND APPRAISAL REPORT
## MARKET DATA ANALYSIS

File No. J0223-II Page #3

Defence

File No. J0223-II

| ITEM | SUBJECT PROPERTY | | COMPARABLE NO. 4 | | COMPARABLE NO. 5 | | COMPARABLE NO. 6 | |
|---|---|---|---|---|---|---|---|---|
| Address 505 W Saddle Butte Way | | | 1900 Bohnetts Road | | | | | |
| Jackson | | | Jackson | | | | | |
| Proximity to Subject | | | 1.69 miles | | | | | |
| Sales Price | $ | Refinance | | $ 675,000 | | $ | | $ |
| Price | $ | Estimate | | $ 675,000 | | $ | | $ |
| Data Source | Inspection | | MLS #B300971/Inspection | | | | | |
| Date of sale and | DESCRIPTION | | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. | DESCRIPTION | +(−)$ Adjust. |
| Time Adjustment | N/A | | 5/01/04 | | | | | |
| Location | Jackson | | Jackson-Inf | +67,500 | | | | |
| Site/View | Mountains/Valley | | Mountains-Inf | +67,500 | | | | |
| Acreage | 16.58 Acre | | 11.70 Acre | +48,600 | | | | |
| Utilities | Elec/Well/Septic | | Similar | | | | | |
| Hillside | Moderate | | Moderate | | | | | |
| Elk Refuge | None | | None | | | | | |
| Sales or Financing | None Reported | | None Reported | | | | | |
| Concessions | | | | | | | | |
| Net Adj. (Total) | | | ☒ + ☐ − | $ 183,600 | ☐ + ☐ − | $ | ☐ + ☐ − | $ |
| Indicated Value | | | Net 27.2 % | $ 858,600 | Net % | $ | Net % | $ |
| of Subject | | | | | | | | |

Comments: The subject enjoys good access to consumer services and Jackson proper, the site is partially wooded with views of he surrounding mountains and valley. There have been no recent reported sales within the subdivision, therefore all comparables used are outside the subject development.

C-1  Comparable One location is inferior to that of the subject, however the view of the Tetons is considered superior  and a 10% adjustment is made for a superior view. The topography is considered superior and a 5% adjustment is made. Incremental acreage adjusted at $10,000 per acre

C-2  Comparable Two location is inferior to that of the subject and a 10% adjustment is made. Incremental acreage is adjusted at $10,000 per acre.

C-3  Comparable Three location is similar to that of the subject and no adjustment is made for location, a 10% adjustment is made for Teton Views, there is also a 10% adjustment made for bordering the Elk Refuge. A  5% adjustment is made for superior topography. Incremental acreage is adjusted at $10,000 per acre.

C-4  Comparable Four location is inferior to that of the subject and a 5% adjustment is made, view is inferior and a 10% adjustment is made, incremental acreage is adjusted at $10,000 per acre.

File No. J0223-I Page #4

## Supplemental Addendum

File No. J0223-I

| | | | |
|---|---|---|---|
| Borrower/Client Defelice, Michael | | | |
| Property Address 505 W Saddle Butte Way | | | |
| City Jackson | County Teton | State Wy | Zip Code 83001 |
| Lender U.S. Trust | | | |

The report states the subject has not been listed, optioned or sold in the past 36 months. This is the sales history for the past 36 months.

As per state regulation Craig Smith is a registered trainee # 713, he will be certified in approximately another 60-90 days. Wyoming state law does not require the supervisor to inspect properties when a trainee has the proper time and experience.

| | | |
|---|---|---|
| Signature | Signature | |
| Name Kevin B. Wood Wright Appraisal Services LLC | Name Kevin Wood Wright Appraisal | |
| Date Signed February 02, 2005 | Date Signed February 02, 2005 | |
| State Certification # | State | State Certification # | State |
| Or State License # 543 | State | Or State License # 543 | State |

Bainbridge Appraisal Group
Form TADD2 — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. J0223-II | Page #5

### Subject Photo Page

| Borrower/Client | Defelice, Michael | | | |
|---|---|---|---|---|
| Property Address | 505 W Saddle Butte Way | | | |
| City | Jackson | County | Teton | State Wy | Zip Code 63001 |
| Lender | U.S. Trust | | | |



**Subject Front**

505 W Saddle Butte Way
Sales Price            Refinance
Gross Living Area
Total Rooms
Total Bedrooms
Total Bathrooms
Location              Jackson
View                 Mountains/Valley
Site
Quality
Age



**Subject Rear**



**Subject Street**

File No. J0223-H Page #6

## Comparable Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client   Defelice, Michael | | | |
| Property Address   505 W Saddle Butte Way | | | |
| City   Jackson | County   Teton | State   Wy | Zip Code   83001 |
| Lender   U.S. Trust | | | |



### Comparable 1

550 Phelps Canyon Road

| | |
|---|---|
| Prox. to Subject | 8.78 miles |
| Sale Price | 975,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Jackson-Inf |
| View | Mountains/Teton View-Sup |
| Site | |
| Quality | |
| Age | |



### Comparable 2

22550 Buffalo Valley Road

| | |
|---|---|
| Prox. to Subject | 12.34 miles |
| Sale Price | 925,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Moran-Inf |
| View | Mountains/Valley |
| Site | |
| Quality | |
| Age | |



### Comparable 3

2050 Nowlin Trail North

| | |
|---|---|
| Prox. to Subject | 4.22 miles |
| Sale Price | 1,562,500 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Jackson-Sim |
| View | Mountain/Teton View-Sup |
| Site | |
| Quality | |
| Age | |

File No. J02234I Page #7

## Comparable Photo Page

| | | | |
|---|---|---|---|
| Borrower/Client | Defolice, Michael | | |
| Property Address | 505 W Saddle Butte Way | | |
| City Jackson | County Teton | State Wy | Zip Code 83001 |
| Lender U.S. Trust | | | |



### Comparable 4

1900 Bohnetts Road
| | |
|---|---|
| Prox. to Subject | 1.69 miles |
| Sale Price | 675,000 |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | Jackson-Inf |
| View | Mountains-Inf |
| Site | |
| Quality | |
| Age | |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sale Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

File No. 40223-1 Page #8

## Location Map

| Borrower/Client | Deronze, Michael | | | |
|---|---|---|---|---|
| Property Address | 505 W Saddle Butte Way | | | |
| City | Jackson | County | Teton | State | Wy | Zip Code | 83001 |
| Lender | U.S. Trust | | | |





Form MAP PLAT — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Plat Map

| Borrower/Client | Dotoico, Michael | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 505 W Saddle Butte Way | | | | | | |
| City | Jackson | County | Teton | State | Wy | Zip Code | 83001 |
| Lender | U.S. Trust | | | | | | |

**STATE OF WYOMING**

NON TRANSFERABLE

Permit Number  543                                    № 11564

## CERTIFIED REAL ESTATE APPRAISER PERMIT

KEVIN B. WEED                                        Expires:  4/02/2005
CERTIFIED RESIDENTIAL APPRAISER
AS PROVIDED FOR BY THE LAWS OF WYOMING

AUTHORIZED BY THE WYOMING CERTIFIED REAL ESTATE APPRAISER BOARD
WITNESS MY NAME AND THE OFFICIAL SEAL AT CHEYENNE, WYOMING.

Issued:  4/29/2002

RESORT APPRAISAL SERVICE
9124 NORTH RANCHLANDER DRIVE
PARK CITY, UT 84098

Constance K. Anderson
CONSTANCE K. ANDERSON Ex Officio

THIS LICENSE SHALL BE KEPT IN THE CUSTODY OF THE RESPONSIBLE BROKER
AND RETURNED TO THE REAL ESTATE DIRECTOR UPON TERMINATION.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

  * Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2. I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3. I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4. I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5. I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6. I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7. I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8. I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9. I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** 505 W Saddle Butte Way, Jackson, Wy 83001

| APPRAISER: | SUPERVISORY APPRAISER (only if required): |
|---|---|
| Signature: _Craig Smith_ | Signature: |
| Name: Craig Smith, Smith Appraisal Services LLC | Name: Kevin W. Smith, Smith Appraisal |
| Date Signed: | Date Signed: February 22, 2005 |
| State Certification #: | State Certification #: |
| or State License #: Registration # 713 | or State License #: 543 |
| State: WY | State: WY |
| Expiration Date of Certification or License: | Expiration Date of Certification or License: 4/08/05 |
| | ☐ Did   ☒ Did Not Inspect Property |

Form ACR — "TOTAL for Windows" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. J0223-I   Page #13

| | |
|---|---|
| Borrower: Defolice, Michael | File No. J0223-I |
| Property Address: 505 W Saddle Butte Way | |
| City: Jackson | County: Teton | State: WY | Zip Code: 83001 |
| Lender: U.S. Trust | |

## APPRAISAL AND REPORT IDENTIFICATION

This appraisal conforms to one of the following definitions:

☒ **Complete Appraisal**   (The act or process of estimating value, or an opinion of value, performed without invoking the Departure Rule.)

☐ **Limited Appraisal**   (The act or process of estimating value, or an opinion of value, performed under and resulting from invoking the Departure Rule.)

This report is one of the following types:

☐ **Self Contained**   (A written report prepared under Standards Rule 2-2(a) of a Complete or Limited Appraisal performed under STANDARD 1.)

☒ **Summary**   (A written report prepared under Standards Rule 2-2(b) of a Complete or Limited Appraisal performed under STANDARD 1.)

☐ **Restricted**   (A written report prepared under Standards Rule 2-2(c) of a Complete or Limited Appraisal performed under STANDARD 1, restricted to the stated intended use by the specified client or intended user.)

### Comments on Standards Rule 2-3

I certify that, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

I have no (or the specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

My analyses, opinions and conclusions were developed and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

I have (or have not) made a personal inspection of the property that is the subject of this report.

No one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

### Comments on Appraisal and Report Identification
Note any departures from Standards Rules 1-3 and 1-4, plus any USPAP-related issues requiring disclosure:

**APPRAISER:**

Signature:

Name: Craig Smith/Regal Appraisal Services LLC

Date Signed: February 02, 2005

State Certification #:

or State License #: Registration # 713

State: WY

Expiration Date of Certification or License:

**SUPERVISORY APPRAISER (only if required):**

Signature:

Name: Kevin Wood/Regal Appraisal

Date Signed: February 02, 2005

State Certification #:

or State License #: 543

State: WY

Expiration Date of Certification or License: 4/08/05

☐ Did   ☒ Did Not   Inspect Property

Bainbridge Appraisal Group

File No. J0223-1 Page #14

## FIRREA / USPAP ADDENDUM

Borrower   Defelice, Michael
Property Address   505 W Saddle Butte Way
City   Jackson                County   Teton                State   Wy                Zip Code   83001
Lender/Client   U.S. Trust

**Purpose**
The purpose of the appraisal is to estimate the fee simple market value of the Subject property including site an all improvements.

**Scope**
The appraiser has performed an extensive investigation of the Subject property including site and all improvements located therein. The information and analysis is prepared in summary report format and is intended to comply with the Uniform Standards of Professional Appraisal Practice (USPAP) understanding that Wyoming is a non-disclosure state. Any and all information contained herein is deemed reliable and accurate.

**Intended Use / Intended User**
The intended use of this appraisal report is the appraiser's client and described in the appraisal report or any other person associated with the lending division of that company as well as the FDIC and other regulatory agencies

**History of Property**
Current listing information:   The property is not currently listed and no listing history was found through normal methods for the past 36 months.

Prior sale:   The property is not currently listed and no listing history was found through normal methods for the past 36 months.

**Exposure Time / Marketing Time**
The expected marketing time for this property is 12 - 24 months.

**Personal (non-realty) Transfers**

**Additional Comments**

**Certification Supplement**
1.  This appraisal assignment was not based on a requested minimum valuation, a specific valuation, or an approval of a loan.
2.  My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result or the occurrence of a subsequent event.

Appraiser   Craig W Smith/Resort Appraisal Services LLC
Effective date / Report date:                2/2/05

Supervisory Appraiser   Keith Wood/Resort Appraisal
Effective date / Report date                2/2/05

## OPEN SPACE EASEMENT

This Open Space Easement (this "Instrument") is made and entered into effective this 5th day of January, 1998 by and between Rob Broadbent and K'Lea Andreas, their successors and/or assigns (hereinafter referred to as the "Grantor"), and the TETON COUNTY SCENIC PRESERVE TRUST (hereinafter referred to as the Grantee") a trust comprised of the Teton County Commissioners as Trustees and established pursuant to the Teton County Scenic Resources Resolution.

### WITNESSETH:

WHEREAS, Grantor owns certain land located in Teton County, Wyoming, consisting of approximately twenty two and one half (22 ½) acres (referred to herein as the "Property") more particularly described in Exhibit "A" attached hereto and by this reference made a part hereof;

WHEREAS, much of the Property is currently undeveloped;

WHEREAS, in the Teton County Comprehensive Plan, Teton County has adopted goals and objectives which foster, promote and encourage preservation of land as open space for preservation of wildlife habitat, scenic resources, or agricultural uses;

WHEREAS, preservation of open space contributes much to the perpetuation of Teton County's western heritage and rural landscape, provides a special visitor experience, and may provide large blocks of space that benefit various types of wildlife;

WHEREAS, preservation of open space is important to the wildlife and scenic qualities and western atmosphere of Teton County, and therefore, to the tourist-based economy;

WHEREAS, the Property has scenic, wildlife and/or agricultural values (hereinafter referred to a "Open Space Values:) of importance to the people of Teton County, Wyoming, and their protection will yield a significant public benefit;

WHEREAS, the Teton County Land Development Regulations permit an increase in development potential in exchange for preservation of Open Space;

WHEREAS, the current Teton County Land Development Regulations permit two (2) dwelling units on twenty two and one half (22 ½) acres if seventy percent (70%) of the base site area of the property is reserved as Open Space;

WHEREAS, Grantor desires to preserve and protect the natural, scenic and agricultural values of a portion of the Property and to take advantage of an increase in development potential in exchange for doing so;

WHEREAS, Grantor is willing to preserve seventy percent (70%) of the base site area of the Property as open space in consideration of his ability to develop two (2) dwelling units on the Property;

NOW, THEREFORE, in consideration of the increase in development potential to which Grantor shall be entitled by Teton County's Land Development Regulations, and the execution and acceptance of this Instrument and the Grantor's and Grantee's agreement thereby to abide by the terms and conditions hereof, Grantor grants and conveys to the Grantee an Open Space Easement as hereinafter defined (the "Open Space Easement" or "Easement") over and across a portion of the Property described in Exhibit "B" and hereinafter referred to as to "Open Space" to preserve and protect the Open Space Values of the Property, which Open Space Easement shall be an easement in gross, shall benefit and be enforceable by the Grantee, and shall bind Grantor and Grantor's successors in ownership and/or use of the Property. Grantor warrants to the Grantee that the Open Space Easement is not subject to any senior mortgage, lien, or other encumbrance other than restrictive covenants, road and utility easements, and other similar encumbrances of sight or record existing at the time this



RELEASED
IN
ABSTRACT
SCANNED

Grantor: BROADBENT, ROB ET AL
Grantee: TETON COUNTY SCENIC PRESERVE•
Doc 0455554 bk 346 pg 1182-1188 filed at 4:22 on 01/06/98
V Jolynn Coonce, Teton County Clerk fees: 18.00
By JULIE HODGES   Deputy

**Exhibit E**

Instrument is signed, which could adversely affect or remove the covenants contained herein.

1.   PURPOSE.  The purpose of the Easement granted herein is to preserve and protect the Open Space Values of the Open Space and to confine the use of the Open Space to agricultural, wildlife, natural, scenic, open space, recreation, and other such uses consistent with the preservation and protection of said features and values.

2.   AFFIRMATIVE RIGHTS CONVEYED BY THIS INSTRUMENT.  The affirmative rights conveyed to the Grantee by this instrument include the following:

2.1   Preservation of Open Space Values.  To preserve and protect the Open Space Values of the Open Space.

2.2   Entrance onto Open Space.  To enter upon the Open Space to enforce the rights herein granted and in connection therewith to inspect and observe the Open Space, all in a manner that will not unreasonably interfere with the proper uses being made of the Open Space at the time of such entry and upon reasonable prior notice given by or on behalf of the Grantee to one or more of the then owners of the Property provided that no such notice shall be required when the Grantee reasonably determines that immediate entry upon the Property is essential to prevent or mitigate a material violation of this Open Space Easement.

2.3   Enforcement.  To enjoin any activity on or use of the Open Space that is inconsistent with the Open Space Easement and to enforce the restoration of such areas or features of the Open Space that may be damaged by any such inconsistent activity or use, pursuant to Paragraph 5, Enforcement of Open Space Easement.

3.   USE OF THE OPEN SPACE.  Grantor intends that this Open Space Easement shall restrict the use and development of the Open Space to uses that preserve its Open Space Values – wildlife, scenic, natural, recreation and other such uses as are consistent with protection of the Open Space Values and not specifically prohibited herein.

4.   PROHIBITED USES AND PRACTICES.  The following uses shall be prohibited on the Open Space:

4.1   Buildings.  The construction or location of any buildings, structures or accessory structures.

4.2   Industrial or Mining Use.  Dredging, mining, excavation or the exploration for, extraction or processing of oil and gas or minerals, or the removal or processing of rock, sand and gravel not associated with a wildlife or fisheries habitat improvement project, or any other industrial use of the Open Space.

4.3   Off-Road/Off-Trail Transportation.  Off-road use of vehicles and off-trail use of any form of motorized transportation, except where needed for maintenance and upkeep of the Open Space and excepting that a snowmobile may be used to set cross country ski tracks.

4.4   Dumping and Storage.  The storage of recreational vehicles (including, but not limited to, boats, campers and motor homes).  Dumping or storing of ashes, trash, garbage, junk or other unsightly or offensive materials.

4.5   Feedlot.  Establishment or maintenance of any livestock feedlot.  A feedlot is a relatively small, confined land area used for fattening livestock.  The normal and usual feeding operations which have been traditionally conducted on ranches and farms in Teton County are not considered feedlots.

4.7   Clearing or Grading.  Clearing, grading or other movement of the natural topography of the land except such activities in connection with fisheries development, wildlife habitat improvement or clearing for safety purposes (e.g., deadfall).

5.    ENFORCEMENT OF OPEN SPACE EASEMENT.

5.1    Enforcement.  Any violation of the Open Space Easement shall be subject to termination through the procedures outlined in the Teton County Land Development Regulations for Enforcement in force at the time of the violation or through injunctive proceedings with the imposition of temporary restraining orders, or through any other legal means.  The Grantee shall have the right to enforce the restoration of the portions of the Open Space affected by activities in violation of the Easement to the condition which existed prior to the violation.

5.2    No Waiver.  Failure by the Grantee to exercise its rights under this Instrument in the event of any breach of any of the provisions of this Instrument shall not be deemed or construed to be a waiver of the Grantee's rights hereunder as to that breach or any subsequent breach.

5.3    Fees and Costs.  In the event of dispute or enforcement of the Open Space Easement, the prevailing party shall be entitled to recover its reasonable attorney's fees and costs incurred in connection therewith, whether or not judicial proceedings are initiated.

6.    TRANSFER OF OPEN SPACE EASEMENT.  If the Grantee determines that it no longer is able to enforce its rights under this Instrument or that it no longer desires to enforce said rights, or if the Grantee ceases to exist or is otherwise prevented from enforcing its rights under this Instrument, the Grantee shall as soon as practicable convey all its rights under this Instrument and deliver a copy of this Instrument to an organization designated by the Grantor and agreed to by the Grantee to ensure that the Open Space Easement and this Instrument, in general, are enforced.

7.    OPEN SPACE EASEMENT GRANTED IN PERPETUITY.  The Open Space Easement shall be a burden upon and shall run with the Open Space in perpetuity and shall bind Grantor and Grantor's successors in ownership and/or use of the Open Space forever.  If the land use regulations change in the future, the easement may be modified by the mutual consent of the Grantee and the Grantor.

8.    INDEMNIFICATION OF THE GRANTEE.  The Owners of the Open Space shall pay all real estate taxes or assessments levied by competent authorities upon the Open Space, and the Grantee shall have no obligation or responsibility for payment of taxes or assessments levied upon any of said Open Space.

9.    WAIVER OF HOMESTEAD EXEMPTION.  Grantor and Grantor's Spouse hereby release and waive all rights under and by virtue of the homestead exemption laws of the State of Wyoming, insofar as any of such rights affect the conveyance set forth herein.

10.    CONDITION OF THE PROPERTY.  The Property is located on East Gros Ventre Butte about ¼ mile northwest of the Town of Jackson.  The topography of the Property is varied and ranges in elevation from approximately 6,400 feet to 7,000 feet. Slopes are generally 5% to 15% with approximately 10 acres exceeding 25%.  The Property is presently undeveloped.  It is in its natural state, being covered by native grasses and sagebrush.  There are three aspen stands present on the Property.  An Environmental Analysis of the Property was prepared by Biota Research and Consulting, Inc. dated June 1, 1997.  This report was included as part of the submittal package to Teton County for the development plan of the Property and is on file with the Teton County Planning Office.  It defines the present conditions of the Open Space and includes an inventory of the relevant resources and features of the Property.  The Grantor and Grantee agree that this report is an accurate representation of the Property, including the Open Space affected at the time of the signing of this instrument.

11.    DEFINITIONS.

11.1    Grantor.  The term "Grantor," as used herein, shall mean Grantor and Grantor's successor in ownership and/or use of the Open Space or any affected portion thereof, including tenants, lessees, and licensees.

11.2    Grantee.  The term "Grantee," as used herein, shall mean the Teton County Scenic Preserve Trust, and the permitted successors and assigns of the Teton County Scenic Preserve Trust.

11.3 <u>Existing</u>. The term "existing," as used herein, shall mean existing at the time of the signing of this instrument.

12. <u>MISCELLANEOUS</u>.

12.1 <u>Severability</u>. If any provisions of this instrument or the application thereof to any person or circumstance is found to be invalid, the remainder of this instrument and the application of such provisions to persons or circumstances other than those as to which the provisions or application is found to be invalid shall not be affected.

12.2 <u>Recordation.</u> This instrument shall be recorded in the Office of the County Clerk of Teton County, Wyoming.

12.3 <u>Reference in Subsequent Documents</u>. Reference to the Open Space Easement Shall be made in a separate paragraph of any subsequent deed or other legal instrument by which any interest (including a leasehold interest) in the Property is conveyed, and said reference shall include the recording data of this instrument. Failure to comply with this requirement shall not adversely affect the Grantee's rights under this instrument in any way.

12.4 <u>Public Access</u>. This Instrument creates no right in the general public to physical access to or on any portion of the Property or Open Space.

IN WITNESS WHEREOF, Grantor has executed this instrument effective the day and year first above written.

GRANTOR:

_____
Rob Broadbent

_____
K'Lea Andreas

STATE OF WYOMING )
                 )ss
COUNTY OF TETON  )

The foregoing instrument was acknowledged before me by Rob Broadbent on this 5th day of January, 1998.

Witness my hand and official seal.

_____
Notary Public

My commission Expires: 12-20-2000

The foregoing instrument was acknowledged before me by K'Lea Andreas on this 5th day of January, 1998.

Witness my hand and official seal.

_____
Notary Public

My commission Expires: 12-20-2000

STATE OF WYOMING      )
                      )ss
COUNTY OF TETON       )


        Accepted and agreed to by the Teton County Scenic Preserve Trust this
_____ day of _____, 1998.


_____          _____
Sandy Shuptrine, Trustee                    Bob Shervin, Trustee


_____          _____
Mike Gierau, Trustee                        Bill Paddleford, Trustee


_____
Ann Stephenson, Trustee


Attest:                                     _____
                                            V. Jolynn Coonce, County Clerk


STATE OF WYOMING      )
                      ) ss
COUNTY OF TETON       )


        The foregoing instrument was acknowledged before me by Sandy Shuptrine,
Bob Shervin, Mike Gierau, Bill Paddleford, and Ann Stephenson on this ____ day of
_____, 1998.

        Witness my hand and official seal.


_____          My commission Expires: _____
Notary Public

SADDLE BUTTE RANCH SUBDIVISION

Those parts of the NE¼NW¼ and NW¼NE¼ Section 28, T41N, R116W, Teton County, Wyoming described as follows:

Beginning at the E 1/16 corner between Sections 21 and 28, T41N, R116W, said point being marked by a 2" diameter brass cap;
THENCE S 02°15'40" W, 400.00 feet along the east line of said NW¼NE¼ to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";
THENCE N 89°31'16" W, 570.04 feet to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";
THENCE S 56°00'49" W, 626.25 feet to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";
THENCE S 06°55'36" W, 239.56 feet to a point which is identical with a point on the east boundary of that tract of land of record in book 156 of photo, pages 331 to 333 in the Office of the Clerk of Teton County and the most southerly corner of the tract of land of record in book 137 of photo, pages 50-51 in said Clerk's Office;
THENCE N 14°01'23" W, 124.14 feet along the east boundary of said record tract in book 137 of photo;
THENCE N 17°18'06" W, 112.63 feet continuing along the northeasterly boundary of said record tract in book 137 of photo;
THENCE N 25°47'40" W, 100.72 feet continuing along the northeasterly boundary of said record tract in book 137 of photo;
THENCE N 29°17'08" W, 83.64 feet continuing along the northeasterly boundary of said record tract in book 137 of photo;
THENCE N 52°25'21" W, 54.20 feet continuing along the northeasterly boundary of said record tract in book 137 of photo;
THENCE N 60°19'09" W, 49.90 feet continuing along the northeasterly boundary of said record tract in book 137 of photo to the most easterly corner of the tract of land of record in book 67 of photo, pages 370 to 372 in said Clerk's Office;
THENCE N 40°21'31" W, 153.01 feet along the northeasterly boundary of said record tract in book 67 of photo;
THENCE N 44°30'56" W, 349.80 feet continuing along the northeasterly boundary of said record tract in book 67 of photo;
THENCE S 11°39'05" W, 111.40 feet along the westerly boundary of said record tract in book 67 of photo to the most easterly corner of the tract of land of record in book 41 of photo, pages 455-456 recorded in said Office;
THENCE S 89°51'05" W, 419.62 feet along the northerly boundary of said tract in book 41 of photo to the most westerly corner of said tract in book 41 of photo, identical with the most easterly corner of the tract of land of record in book 30 of photo, pages 380-381 in said Clerk's Office;
THENCE N 64°54'00" W, 76.22 feet along the easterly boundary of said tract in book 30 of photo to the most southerly corner of the tract of land recorded in book 168 of photo, page 495 in said Clerk's Office;
THENCE N 23°39'00" E, 86.41 feet along the easterly boundary of said record tract in book 168 of photo;
THENCE N 10°30'00" E, 198.75 feet along the easterly boundary of said record tract in book 168 of photo to an intersection with the north line of said Section 28;
THENCE S 88°48'00" E, 898.74 feet along the north line of said Section 28 to the N¼ corner, marked by a 2" diameter brass cap;
THENCE S 89°31'16" E, 1254.67 feet along the north line of said Section 28 to the E 1/16 corner identical with the Point of Beginning.

Encompassing an area of 22.57 acres, more or less.


Pierson Land Surveys, PC
Jackson, Wyoming
October 23, 1997


EXHIBIT "A"

DESCRIPTION OF OPEN SPACE
FOR
SADDLE BUTTE RANCH SUBDIVISION

That part of Lot 2 of Broadbent Subdivision recorded as plat no. _____ in the Office of the Clerk of Teton County, Wyoming described as follows:

Beginning at the E 1/16 corner between Sections 21 and 28, T41N, R116W, said point being marked by a 2" diameter brass cap;

THENCE S 02°15'40" W, 400.00 feet along the east line of said NW¼NE¼ to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";

THENCE N 89°31'16" W, 570.04 feet to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";

THENCE S 56°00'49" W, 626.25 feet to a point marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";

THENCE S 06°55'36" W, 239.56 feet to a point which is identical with a point on the east boundary of that tract of land of record in book 156 of photo, pages 331 to 333 in the Office of the Clerk of Teton County and the most southerly corner of the tract of land of record in book 137 of photo, pages 50-51 in said Clerk's Office;

THENCE N 14°01'23" W, 124.14 feet along the east boundary of said record tract in book 137 of photo;

THENCE N 17°18'06" W, 112.63 feet continuing along the notheasterly boundary of said record tract in book 137 of photo;

THENCE N 25°47'40" W, 32.84 feet continuing along the notheasterly boundary

THENCE N 09°12'58" E, 312.10 feet to a point;

THENCE N 60°00'00" E, 148.67 feet to a point;

THENCE N 31°00'00" W, 260.00 feet to a point;

THENCE S 61°41'30" W, 249.03 feet to an intersection with the westerly lot line of said Lot 2;

THENCE N 03°24'00" E, 112.48 feet along said westerly line to a 5/8" diameter rebar with cap inscribed "PLS 3831";

THENCE N 21°00'00" W, 150.00 feet continuing along said west line to the northwest corner of said lot 5 marked by a 5/8" diameter rebar with cap inscribed "PLS 3831";

THENCE S 88°46'00" E, 178.74 feet along the north line of said lot 2 to the N¼ corner of Section 28, marked by a 2" diameter brass cap;

THENCE S 89°31'16" E, 1254.67 feet along the north line to the E 1/16 corner identical with the Point of Beginning.

Encompassing an area of 14.22 acres, more or less.

All in accordance with the map to be filed in the Office of the Clerk of Teton County, Wyoming titled "Saddle Butte Ranch Subdivision, located within NE¼NW¼ and NW¼NE¼ Section 28, T41N, R116W, Teton County, Wyoming".

Pierson Land Surveys, PC
Jackson, Wyoming
October 2, 1997

f:\1997\97058\wp\97058leg.wpd

EXHIBIT "B"



08/02



**WYOMING CERTIFIED REAL ESTATE APPRAISER BOARD**
2020 CAREY AVENUE, SUITE 702
CHEYENNE, WYOMING 82002
(307) 777-7141

## VERIFIED COMPLAINT

**PLEASE NOTE:** The Wyoming Certified Real Estate Appraiser Board does not have the powers of a Court, hence can only suspend or revoke certifications or censure appraisers. The Wyoming Certified Real Estate Appraiser Board cannot provide legal advice or services.

---

**INSTRUCTIONS:** Please type or print clearly in ink, fill out all applicable sections of this form completely and accurately, attach legible copies of documents relating to your complaint which may include a complete appraisal report. You must provide all information which you know or can discover with reasonable investigation. For assistance in filling or filing this Complaint, contact the Wyoming Certified Real Estate Appraiser Board. If more space is needed, attach extra sheets.

MAY 2008
FILED
WYOMING
CERTIFIED
APPRAISAL
BOARD

---

### COMPLAINANT(S)

1. NAME(S): (Mr.)(Ms.)(Mrs)(Miss) Mr + Mrs. Richard LaBrecque

   ADDRESS: PO Box 186

   CITY, STATE, & ZIP CODE: Bondurant, WY 82922

   TELEPHONE #: (HOME) 307-859-8836 (BUSINESS) Same

   OCCUPATION(S): Well Driller

   E-MAIL ADDRESS: labrecque@wyoming.com

### APPRAISER(S) COMPLAINED ABOUT

2a.  Name: Craig Smith

   Firm Name: River's Edge Appraisal Service

   Address: Freedom, WY

   Telephone #: 307.883-0137

2b.  Name: _____

   Firm Name: _____

   Address: _____

   Telephone #: _____

**Exhibit F**
001

**3. Type of appraiser transaction:**

Residential X   Commercial ___   Recreational ___   Agricultural ___   Industrial ___

Other: _____

**4. I __X__ have _____ have not contacted the person(s) complained about and attempted to resolve this matter.**

Person(s) and dates contacted: _Craig Smith_   _3/29/08_
_____

Results: _Unknown if resubmission of appraisal_
_to Citibank was actually done._

**5. I _____ have _____ have not retained an attorney to assist in resolving this or a related matter.** _Still unknown but under consideration._

Attorney's   Name: _____   Telephone: _____
_____

Attorney's Address: _____

May we contact your attorney regarding this matter? _____

**6. This Complaint involves the same related matters which are the subject of a civil law suit which:**
_____ has been completed _____ has been filed _____ will be filed _____ may be filed in a court of law.

Court Name: _____ Case # _____

Address: _____

Type of Action: _____

Case Status: _____

**7. I __X__ am _____ am not willing to appear under oath as a witness, subject to cross-examination concerning the allegation made in this Complaint. (The Complainants unwillingness to testify may be the basis for the Board dismissing the Complaint after its investigation and preliminary consideration.)**

**8. I understand a copy of this Complaint may be given to any person or firm against whom I have complained. Specific statutory or regulatory violations you are alleging:**

_____
_____
_____
_____

**9. Attached are clear copies of all pertinent documents and papers which directly or indirectly relate to this Complaint.**



**10. Specific factual allegations upon which your Complaint is based: (In your own words, state all of the facts which relate to your Complaint, providing dates and places. Please be specific. You may attach extra sheets.)**

See Letter of Explanation

_Richard LaBrecque + Valerie LaBrecque_

**11. I (we), the Complainant(s), declare under oath that the above is true to the best of my (our) knowledge.**

Dated this _7th_ day of _May_ , _2008_ .

Complainant(s):

_____          _____
(signature)                                    (signature)

State of: _Wyoming_ )

County of: _Sublette_ )

Subscribed and sworn to before me by _Richard LaBrecque + Valerie LaBrecque_

on this _7th_ day of _May_ ,
_2008_ .

_Luwana Schadwill_
Notary Public

My commission expires: _7/24/2008_

LUWANA SCHADWILL – NOTARY PUBLIC
COUNTY OF                     STATE OF
SUBLETTE      SEAL            WYOMING
My Commission Expires   7/24/2008

---

## BOARD ACTION ON COMPLAINT

Your Complaint will be investigated by the Board's staff and attorney. Our investigator is likely to contact you during his investigation. Please advise him if you move or there are additional developments related to your Complaint. If you resolve your differences with the appraiser(s) and/or withdraw your complaint, the Board will consider any request to dismiss the case; however, it need not do so. When the investigation is complete, the Board will preliminarily consider the case to determine its appropriate action, including setting it for hearing, tabling it pending related litigation, or dismissal (if, for example, there is no apparent jurisdiction over your Complaint). If a matter is set for hearing, you are likely to be called as a witness for the State. The State's case at any hearing will be presented by a State attorney. You will be advised of the case outcome. Thank you for your interest and cooperation.

MAY 2008

CERTIFIED
APPRAISAL
BOARD

## VERIFIED COMPLAINT FORM MUST BE NOTARIZED IN ORDER TO PROCESS

004

April 30, 2008
LETTER OF EXPLANATION

On Feb 24, 2008, we applied to Citibank for an increased home equity line of credit. We had a written letter of approval contingent upon getting higher insurance for our property which we did. Citibank obtained an erroneous and inaccurate appraisal done in 2005 by Craig Smith of River's Edge Appraisal (formerly Resort Appraisal, from Salt Lake City). This appraisal was done to get a relatively small loan, which we did receive even with this bogus appraisal report, so we let it slide. What a mistake. Had I know how that would come back to bite me in the near future, I would have done then what I'm doing now-formally complaining.

First, Hoback Ranches Subdivision, where my house is located, is about 5 miles off Hwy 189 just south of Bondurant. It is about 1 hour from Jackson & 45 minutes to Pinedale. Vacant lots here are 10 ac. minimum. Some are 80 acres and were originally marketed as vacation property. Now it has become "discovered" as an alternative to Jackson property. Most of the homes being built out here currently are more than 3000 sf and one that is 3000 sf adjacent to my home sold for $696,000 last year. Almost every home for sale here sold last year. In addition to the easy commute to Jackson, Pinedale is now booming from energy development.

My house is round, 36' in diameter, 2-story with an attached insulated garage. There is a 6' x 10' opening between floors for natural light and heat convection. Square footage=$3.14 \times R^2 = 3.14 \times 18^2 \times 2 = 2034.72$. Subtract 10' x 6' for opening and that equals 1975 sf. We had an appraisal done while we were building by the late Lonnie Elliott of Elliott and Assoc. of Pinedale in 1997 and he calculated that same amount. Craig Smith came up with 1659 sf. My house has a half-bath/utility room downstairs, a full bath and ¾ bath upstairs; he lists 1.5 baths which is wrong. The house has 2 bedrooms and an office, which is the same size as one of the bedrooms and could have been listed as 3 bedrooms, but Smith didn't state that. So, his first appraisal was short by 316 sf and a ¾ bathroom. In addition, he states that some of his comparables were 2 yrs old and the one in Merna is almost 50 miles away. When it appeared that Citibank was going to use this old appraisal as a basis for my loan, we demanded a new appraisal be done. Unfortunately, it was to be Craig Smith again. We should have run him off, but time was of the essence and in light of his previous stupidity we figured he would make it right. Boy were we wrong. Even though he sent someone else to take measurements & photos, he appraised the house at only $375,000, only $10,000 more than 2.3 years ago. Citibank declined our loan based solely on this new appraisal. We have not seen this appraisal, we were told that by Citibank. When you factor in the difference in sf, this appraisal is actually less per sf than the original, which was in part based on sales that were already 2 years old. Using his cost approach to value, he valued my house at $115.00/sf. No one can build any type of home 45 miles away from a lumber yard, concrete plant and labor force for $115/sf. That's just plain stupid and totally illogical. However, even using that figures times the difference in real footage comes to an addition $36,340, not $10,000. In addition, when he did the first appraisal, Hoback Ranches had a court ruling closing the roads in winter to all but over-the-snow vehicles.

1

His employees came here on snowmobiles in 2005. This ruling was overturned last year and the road has been plowed for 2 years, yet he sees no increase in value.

When we called him and asked him to justify this ridiculous appraisal he said his #1 comparable was a house just inside of the Ranches and his appraisal was based on this one house. One house? He admitted that one house was what hurt us. This is a beautiful home with top quality appliances and it sold for $355,000. A good appraiser would have wondered why a house south of Bondurant would sell for so cheap, about half of what it was worth, but not this idiot. The house he used as #1 comparable was on a lot divided in half by the main road. Both halves are steep and covenants state only one house can be built on either half, but no guest houses allowed. Furthermore, it encroached upon both adjacent properties and one owner refused to sign a variance. The biggest issue is a +500' dry well-NO WATER!!! This was his #1 comparable?!?! Are you kidding me?? Now, he did not know that was the situation with that house, we told him that info. He claimed he had no idea that was the case. He would have, had he done any research at all. He has a map of this subdivision, he's been out here dozens of times before. Isn't it his job to know that? I have enclosed copies of 4 other homes closer to mine than that one, all sold in 2007 and apparently all were ignored by Smith.

Please look at flexmls. The house on page 1 is right behind me. It has poor access, farther off the main road, 651 sf per floor w/ no stairs. There are ladders between floors with no stairs. There's no septic system, they use composting toilet, water is from a spring and unsafe to drink, lot is steep. The sold price per sf is $207. Home on page 2: good access, nice lot, but it is also a 2 bedroom w/ a very small garage; sold price per foot: $366. If you discount off $100,000 for the other 10 ac it still sold for $290/sf. Home 3 is near the back of the subdivision and is accessible only by snowmobile in winter and was unfinished when it sold for $334/sf. Home 4 is adjacent to mine, it shares the same road as house on page 1 but has no garage; price per sf is $232. Also please find a sales brochure for an unsold house way at the back of this subdivision, down a steep and unplowable hill. The average price of these homes sold including a 30 yr. old home that doesn't have stairs between floors is $249/sf. My real estate broker told me that the average price per sf in this county, which includes all the single wide trailers in Big Piney, Marbleton and homes 80 yrs. old is $225/sf. Mine appraised at $190/sf. My house sits on a nice, relatively flat 10 ac. lot with easy access all year round, off the main plowed road, a 40 gal/min. well and a 500 sf insulated attached garage.

We didn't get to see the 2nd appraisal. Citibank told us the amount. We immediately complained to Smith and he agreed he made mistakes & stated I provided valuable information that would cause him to resubmit his appraisal if Citibank requested it from him. This supposedly was done, but by then it was too late. Citibank declined the loan solely on his appraisal. I already had the line of credit; I just wanted to increase it. I've never missed a payment, didn't have any balance due at that time and my credit score for my wife and I is over 800.

Here's what his ludicrous appraisal cost me: I had to get 2 loans from my local bank that didn't require his appraisal. These included origination fees, title policy and other fees

for about $2000 that I would not have had to pay through Citibank. The loan was for a drilling rig that I had already put $10,000 down of my own money, which I almost lost because of the delay in the resubmission of the appraisal. The rig owner had to make another equipment payment of $8000 which was passed on to me. The time wasted by trucking companies that bid on moving this rig amounted to an additional $1830 over and above the original $4660 because during the days of waiting the price of fuel went up so much that now no driver wanted to come out to Pinedale from Michigan. Two 300' wells were given to another driller because I could not drill their well with a machine that wasn't even here yet. Those wells would have been a significant contribution to my total gross income; another $20,000 gone. But as bad as this financial loss has been, it pales in comparison to the emotional stress that this ordeal has caused both me and my wife. We agonized for weeks prior to making this decision anyway. This is the largest single investment we have ever made. Everything we own is at risk. I flew to the Midwest looking at rigs in 4 states before deciding on the one I bought. To have the whole deal almost ruined by one incompetent person that I've never even met makes me furious. Smith didn't have enough common sense to check with the county to see how much property tax had increased on my house (8-10% per year). This was information he apparently hadn't thought of to check or he would have wondered about the $10,000 increase being so disproportionately low. My experience with Smith is not an isolated incident. My wife does bookkeeping in Jackson and one of her clients paid him to do an appraisal which was so far out there on a $1 million house, that she has vowed to have his license pulled also.

In Pinedale, Smith is known as the "deal killer". The realtors hate him. Some are telling their clients to look for other financing if he's involved. Most appraisers in Jackson don't like doing appraisals in Pinedale; it's not their familiar territory. And a highly respected appraiser in Jackson won't consider doing work in Pinedale. Yet, here's Smith, with the least amount of experience doing work all over western Wyoming. Why? Because he doesn't care as long as he gets paid. He's undercutting everyone else's price and then doing a half-assed job. An independent mortgage broker told me he's the cheapest (Citibank said the same thing), that's why some banks still use him. Smith complained to my wife that he didn't know anything about the homes he used as comparables because the realtors in Pinedale won't help him. He stated most of his information comes from flexmls listings. Why should they help him? I gave him a second chance and his thanks were to make his appraisal even less. He's not being fair, objective or professional. I know there's standard software and formulas for this area, what in the world is he using? He's finding the lowest price sales no matter where or how long ago, therefore not really putting forth any effort to do even that. His $ value is based on this worst case scenario. After all, it's a lot easier, and in his mind, safer than going to the effort for which he is compensated for, to do an honest and thoughtful appraisal. Isn't the proper procedure to dismiss the highest and lowest priced properties and make your evaluation on some middle ground? This guy doesn't even understand who his customer is. The borrower is who pays for this service. Smith is in business through state regulations. I cannot, nor can a realtor, just open up shop as an appraiser. His is a position of trust, due diligence, and professional and fiduciary responsibility with some level of competence thrown in. He has demonstrated none of these virtues to me. It's not fair to me as a taxpayer and

3

property owner (I've had appraisals done by others on my properties that were not contentious or disputed) to force me at my expense to haul him into court to pull his license. He's cost me enough already. There must be some enforcement here. Realtors in Pinedale have told me they've filed complaints with this board against him and yet he's still in business. He's operated under a couple of different business names, and yet he's allowed to continue as Craig Smith, Appraiser. One of his companies prior to this one, Resort Appraisal Service, LLC of Park City, UT was his employer in 2005. He stated to my wife that he was only an apprentice then. Now he's the owner of River's Edge Appraisal in Freedom, Wyoming, about 85 miles from my house. The State of Wyoming needs to do something about him. If I need to get a list of persons that state they've filed a complaint against him, then I will. How is it that someone who affects other people's lives so dramatically, permanently and profoundly can continue being so incompetent and unprofessional for so long is truly beyond me. Please, do something. I consider Smith to be a menace to the people that are or want to be home owners in western Wyoming. He trivializes his chosen profession and makes a mockery of business ethics and appraisal standards. We are so upset and still recovering financially from this debacle that we're considering retaining an attorney and filing a lawsuit against him to recover these extra costs incurred by us and the loss of that income because of him. Frankly, I'd like to make sure he never does business again in Wyoming.

This letter constitutes some pretty lengthy reading material, but I have stated the facts. Please do something about this man. I, or my wife, Valerie, are available for further discussion at anytime. Please call at your earliest convenience. I'd like to know what resolution could come from my complaint against Smith and look forward to speaking with you directly.

Very truly yours,

Richard LaBrecque
PO Box 186
Bondurant, WY  82922
307-859-8836 (hm)
307-360-8886 (Richard) or 360-8889 (Valerie) (cells)



4

208

BEFORE THE WYOMING
CERTIFIED REAL ESTATE APPRAISER BOARD

| | | |
|---|---|---|
| IN THE DISCIPLINARY MATTER OF | ) | |
| CRAIG W. SMITH, WYOMING | ) | |
| CERTIFIED REAL ESTATE RESIDENTIAL | ) | Docket No. A-08-011 |
| APPRAISER | ) | |
| PERMIT NUMBER 713, | ) | |
| | ) | |
| Respondent. | ) | |

## SETTLEMENT AGREEMENT, STIPULATION AND ORDER

COMES NOW, the Investigative Appraiser Board Member (Petitioner), of the Wyoming Certified Real Estate Appraiser Board (Board) and Craig W. Smith (Respondent) pursuant to WYO. STAT. ANN. § 33-39-101 *et seq.*, and the Board Rules and Regulations and hereby enter into this Settlement Agreement, Stipulation and Order (Agreement).

## FINDINGS OF FACT

1. Respondent is a licensed certified residential real estate appraiser in Wyoming and held permit number 713 at all times relevant to this proceeding. The Board has jurisdiction in the matter pursuant to the Wyoming Certified Real Estate Appraiser Act, WYO. STAT. ANN. § 33-39-101 *et seq.*, Wyoming Administrative Procedure Act, WYO. STAT. ANN. § 16-3-101 *et seq.*, and the Board Rules and Regulations.

2. On or about May 21, 2008, the Board received a verified complaint (Docket No. A-08-011) from Mr. and Mrs. Richard LaBrecque (Complainants). The complaint alleged that Respondent provided an erroneous and inaccurate appraisal of the subject property which caused the Complainants to be denied an increased home equity loan. Following an investigation into the issues raised in the complaint, Petitioner finds as follows:

   A. Respondent performed an appraisal on subject property known as 5 Gros Ventre Drive in Bondurant, Wyoming on March 18, 2008, providing two separate reports.

   B. The reports are not credible due to numerous errors as follows:

   (i) Respondent failed to inspect the subject property as certified in the reports.

   (ii) Respondent did not properly conduct the verification of the comparables used.

(iii) Respondent's reports contained math errors and used incorrect adjustments without support.

(iv) Respondent stated in the reports that the subject property has a wood stove but no adjustment has been made in the sales comparison approach.

(v) Respondent made no discussion of water volume or septic capacity of the subject property or comparables in his reports.

(vi) Respondent's scope of work is inaccurate as he states in the reports he used only MLS listings for his comparables and only inspected the exterior of the subject property.

(vii) Respondent failed to search for comparables in the subject property's local area. Comparables used were outside the local market area.

(viii) Respondent did not sufficiently summarize and disclose the extent of the process of collecting, confirming and reporting data used to develop the appraisal.

(ix) Respondent's lack of research on current sales in the subject neighborhood provided a misleading impression of local market conditions and distorted the valuation arrived at.

(x) Respondent identified and stated extra-ordinary assumption(s), hypothetical conditions, or limiting conditions necessary to the appraisal but did not state their effect on the value.

(xi) The reports do not contain sufficient information to enable the person(s) expected to rely on the reports to understand them properly.

(xii) Respondent had two appraisal reports with the same date of value but significantly different value opinions. A difference of $100,000 was the value reached.

(xiii) Respondent did not correctly employ recognized methods and techniques that are necessary to produce a credible appraisal.

(xiv) Respondent did not reconcile the applicability and suitability of the approaches used.

(xv) Respondent failed to include a signed certification in accordance with USPAP Standards Rule 2-3.

3.  By signing this Agreement, Respondent agrees that the findings, as set forth in paragraph 2 above, if proven, constitute separate, distinct and independent violations of the following statutory and regulatory provisions and is, therefore, a basis for disciplinary action against his real estate appraiser permit.

    A.  WYO. STAT. ANN. § 33-39-123, states in pertinent part as follows:

        (a) The board shall upon a written sworn complaint or may upon its own motion investigate the actions of any certified real estate appraiser and may impose an administrative fine not to exceed two thousand five hundred dollars ($2,500.00) for each separate offense, censure the permittee, place the permittee on probation and set the terms of the probation, suspend or revoke any permit issued under this act for any of the following:

        ....

            (iv) Violating any rules or regulations of the board;

            (v) Being negligent or incompetent, as defined in the Uniform Standards of Professional Appraisal Practice, in developing an appraisal, in preparing an appraisal report or in communicating an appraisal.

        ....

    B.  WYO. STAT. ANN. § 33-39-107 states as follows: Each certified real estate appraiser issued a permit to practice under this act shall comply with the standards of professional appraisal practice and ethical rules specified by the Uniform Standards of Professional Appraisal Practice.

    C.  Chapter I of the Wyoming Certified Real Estate Appraiser Board Rules and Regulations, states in pertinent part as follows:

    Section 14. **Regulatory enforcement grounds.** In addition to the statutory grounds for disciplinary action against a permittee (WYO. STAT. ANN. § 33-39-123), the Board may similar take disciplinary action for any of the following:

        (b) Failure or refusal, without good cause, to exercise reasonable diligence in developing an appraisal, preparing an appraisal report or communicating an appraisal;

D. Uniform Standards of Professional Appraisal Practice, 2008 Edition (USPAP), states in pertinent part as follows:

**ETHICS RULE**

Compliance with USPAP is required when either the service or the appraiser is obligated by law or regulation, or by agreement with the client or intended users, to comply. In addition to these requirements, an individual should comply any time that individual represents that he or she is performing the service as an appraiser.

**Conduct:**

An appraiser must perform assignments ethically and competently, in accordance with USPAP.

An appraiser must not engage in criminal conduct.

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodations of personal interest.

An appraiser must not advocate the cause or interest of any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

An appraiser must not communicate assignment results in a misleading or fraudulent manner. An appraiser must not use or communicate a misleading or fraudulent report or knowingly permit an employee or other person to communicate a misleading or fraudulent report.

An appraiser must not use or rely on unsupported conclusions relating to characteristics such as race, color, religion, national origin, gender, marital status, family status, age, receipt of public assistance income, handicap, or unsupported conclusion that homogeneity of such characteristics is necessary to maximize value.

**COMPETENCY RULE**

Prior to accepting an assignment or entering into an agreement to perform any assignment, an appraiser must properly identify the problem to be addressed and have the knowledge and experience to complete the assignment competently; or alternatively, must:

1.  disclose the lack of knowledge and/or experience to the client before accepting the assignment;

2.  take all steps necessary or appropriate to complete the assignment competently; and

3.  describe the lack of knowledge and/or experience and the steps taken to complete the assignment competently in the report.

**USPAP STANDARD 1: REAL PROPERTY APPRAISAL, DEVELOPMENT**, states in pertinent part as follows:

In developing a real property appraisal, an appraiser must identify the problem to be solved and the scope of work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal.

**Standards Rule 1-1**

In developing a real property appraisal, an appraiser must:

(a) be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal;

(b) not commit a substantial error of omission or commission that significantly affects an appraisal; and

(c) not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal in the aggregate affects the credibility of those results.

**Standards Rule 1-2**

In developing a real property appraisal, an appraiser must:

(e) identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal, including:

(i) its location and physical, legal, and economic attributes;

(f) identify any extraordinary assumptions necessary in the assignment;

(g) identify any hypothetical conditions necessary in the assignment; and

(h) determine the scope of work necessary to produce credible assignment results in accordance with the SCOPE OF WORK RULE.

## Standards Rule 1-4

In developing a real property appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results.

(a) When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion.

## Standards Rule 1-6

In developing a real property appraisal, an appraiser must:

(a) reconcile the quality and quantity of data available and analyzed within the approaches used; and

(b) reconcile the applicability and relevance of the approaches, methods and techniques used to arrive at the value conclusion(s).

## USPAP STANDARD 2: REAL PROPERTY APPRAISAL, REPORTING

In reporting the results of a real property appraisal, an appraiser must communicate each analysis, opinion, and conclusion in a manner that is not misleading.

## Standards Rule 2-1

Each written or oral real property appraisal report must:

(a) clearly and accurately set forth the appraisal in a manner that will not be misleading;

(b) contain sufficient information to enable the intended users or the appraisal to understand the report properly; and

(c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment.

## Standards Rule 2-2

Each written real property appraisal report must be prepared under one of the following three options and prominently state which option is used: Self-Contained Appraisal report, Summary Appraisal Report, or Restricted Use Appraisal Report.

(b)The content of a Summary Appraisal Report must be consistent with the intended use of the appraisal and; at a minimum:

(iii) summarize information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment;

(vii) summarize the scope of work used to develop the appraisal;

(viii) summarize the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach, or income approach must be explained;

(x) clearly and conspicuously:

state all extraordinary assumptions and hypothetical conditions; and state that their use might have affected the assignment results; and

(xi) Respondent included a signed certification in accordance with Standards Rule 2-3.

## Standards Rule 2-3

Each written real property appraisal report must contain a signed certification that is similar in content to the following form:

I certify that, to the best of my knowledge and belief:

- the statements of facts contained in this report are true and correct.
- the reported analyses. opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no (or the specified) present or prospective interest in the property that is the subject of this report and no (or the specified) personal interest with the respect to the parties involved.
- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- my engagement in this assignment was not contingent upon developing or reporting predetermined results.
- my compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- my analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice.*
- I have (or have not) made a professional inspection of the property that is the subject of this report. (if more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraised property.)
- no one provided significant real property appraisal assistance to the person signing this certification. (If there are exceptions, the name of each individual providing significant real property appraisal assistance must be stated.)

4.  In lieu of proceeding with a formal contested case hearing for suspension or revocation of his Wyoming certified real estate residential appraiser permit, Respondent hereby voluntarily agrees to the revocation of his residential real estate appraiser permit, for discipline, and in doing so, agrees his conduct, if proven, and as specifically set forth in paragraph 2 above are violations of USPAP and the statutory and regulatory provisions set forth in paragraph 3 above.

5.  Respondent has read this entire Agreement, fully understands its contents, and agrees to abide by the Order set forth herein, in lieu of a contested case hearing. By executing this Agreement, Respondent waives his right to an administrative contested case hearing and all appeals in this matter pursuant to the Wyoming Administrative Procedure Act, WYO. STAT. ANN. § 16-3-101 *et seq.*, the Wyoming Certified Real Estate Appraiser Act, WYO. STAT. ANN. § 33-39-101 *et seq.*, and the Board Rules and Regulations.

6.  Respondent understands this Agreement is a disciplinary measure and shall become a permanent part of his record with the Board. Respondent further understands that this Agreement is a public record, and is therefore, subject to inspection and dissemination in accordance with all federal and state laws.

7.  Respondent understands this Agreement must be submitted to the Board, which may either approve or reject the Agreement. Should the Board reject the Agreement, Respondent shall have an opportunity to request a contested case hearing in accordance with the Wyoming Administrative Procedure Act, the Wyoming Certified Real Estate Appraiser Act, and the Board Rules and Regulations.

8.  Neither the Board nor the Petitioner waive sovereign immunity by entering into this Agreement, and both specifically retain immunity and all defenses available to them as sovereign pursuant to WYO. STAT. ANN. § 1-39-104 (a) and all other state law.

9.  Due and proper notice of this matter has been afforded to Respondent, and Respondent agrees he has not been subjected to undue influence, pressure or coercion by Petitioner, the Board, its staff or the Office of the Attorney General, and that he is entering into this Agreement under his own free will after having the opportunity to obtain advice from an attorney regarding the consequences of entering into this Agreement.

## CONCLUSIONS OF LAW

1.  Paragraphs 1-9 of the Findings of Fact are incorporated herein by reference.

2.  The Board has jurisdiction in this matter and over Respondent pursuant to the Wyoming Certified Real Estate Appraiser Act, WYO. STAT. ANN. § 33-39-101 *et seq.*, the Board Rules and Regulations, and the Wyoming Administrative Procedure Act, WYO. STAT. ANN. § 16-3-101 *et seq.*

3.  The Board concludes as follows:

    A. Respondent is a licensed real estate appraiser in the State of Wyoming.

    B. Respondent performed an appraisal on a property providing two separate reports in a careless and incompetent manner which both contained numerous errors that affected the entire appraisal.

4.  The Board concludes that each act of misconduct, as set forth in paragraph 2 of the Findings of Fact constitute separate, distinct and independent violations of the following statutory and regulatory provisions: WYO. STAT. ANN. § 33-39-107; WYO. STAT. ANN. § 33-39-123 (a)(iv); Chapter I, Board Rules and Regulations Section 14(b); Uniform Standards of Professional Appraisal Practice, 2008 Edition, Ethics Rule and Competency Rule; Standard 1: Real Property Appraisal, Development, Standards Rule 1-1 (a)(b) and (c); Standards Rule 1-2 (e)(i),(f),(g) and (h); Standards Rule 1-4 (a); Standards Rule 1-6 (a) and (b); Standard 2: Real Property Appraisal, Reporting, Standards Rule 2-1 (a)(b) and (c); Standards Rule 2-2 (b)(iii),(vii),(viii),(x) and (xi) and Standards Rule 2-3.

## INTENTIONALLY LEFT BLANK

## ORDER

IT IS THEREFORE ORDERED by the Wyoming Certified Real Estate Appraiser Board and settled, agreed and consented by the undersigned that:

1. The Board approves the following disciplinary action against Respondent's Wyoming certified real estate residential appraiser permit on the basis of all the facts and conclusions established in this Agreement:

    A. Respondent shall surrender his Wyoming real estate residential appraiser permit to the Board office within ten (10) days of notification of the Board's full acceptance of this Agreement.

2. This Settlement Agreement, Stipulation and Order constitute disciplinary action and shall become a part of the Respondent's permanent record with the Board. It also constitutes public record and therefore, shall be available for inspection and dissemination in accordance with federal and state law. The following shall appear in a future issue of the Wyoming Real Estate Review:

    Craig W. Smith, River's Edge Appraisal Service, voluntarily surrendered his certified residential appraiser permit for violations of WYO. STAT. ANN. § 33-39-123 (a)(iv); WYO. STAT. ANN. § 33-39-107; Chapter I, Board Rules and Regulations Section 14(b); Uniform Standards of Professional Appraisal Practice, 2008 Edition, Ethics Rule and Competency Rule; Standard 1: Real Property Appraisal, Development, Standards Rule 1-1 (a)(b) and (c); Standards Rule 1-2 (e)(i),(f),(g) and (h); Standards Rule 1-4 (a); Standards Rule 1-6 (a) and (b); Standard 2: Real Property Appraisal, Reporting, Standards Rule 2-1 (a)(b) and (c); Standards Rule 2-2 (b)(iii),(vii),(viii),(x) and (xi) and Standards Rule 2-3.

3. Respondent shall comply with the terms and conditions of this Agreement and shall comply with the Wyoming Certified Real Estate Appraiser Act, the Board Rules and Regulations and the Uniform Standards of Professional Appraisal Practice.

4. The Board shall retain continuing jurisdiction in this matter and take further action as may be necessary to conclude this matter.

5. This Agreement shall become effective upon full execution by all signatories.

**INTENTIONALLY LEFT BLANK**

I have read the foregoing document and fully understand the provisions contained herein. The foregoing Settlement Agreement, Stipulation and Order constitute the full agreement and understanding between myself, Petitioner and the Appraiser Board.

ACCEPTED THIS _____ 24 _____ day of October, 2008.

_____
Craig W. Smith, Respondent
Certified Real Estate Residential Appraiser
Permit Number 713

STATE OF WYOMING          )
                          ) ss
COUNTY OF _Lincoln_       )

The foregoing instrument was subscribed and sworn to before me by Craig W. Smith, personally known to me, on this ___54___ day of October, 2008.

My Commission Expires: 8/25/10

_Jennifer Bryant_
Notary Public

JENNIFER BRYANT
Notary Public
Lincoln County
Wyoming
My Commission Expires 8/25/10

ACCEPTED BY INVESTIGATIVE APPRAISER BOARD MEMBER:

_____
Londa Hillyard, Petitioner                    10/14/08
                                              Date

APPROVED BY AND FOR THE BOARD:

_____
Darwin Pace, Chairman                         11-05-08
Wyoming Certified Real Estate Appraiser Board  Date

APPROVED AS TO FORM:

_____
William L. Weaver                             2 Oct 08
Senior Assistant Attorney General             Date
Attorney for Petitioner

*In the Disciplinary Matter of Craig W. Smith, Docket No. A-08-011*
*Settlement Agreement, Stipulation and Order*
*Page 11 of 11*

Contour Investment Properties
172 Center St. Suite 200
PO Box 1152
Jackson, WY 83001
Phone: 307-733-5400  Office Fax: 307-739-1152

CONTRACT TO BUY AND SELL REAL ESTATE
(FARM & RANCH)
(VACANT LAND)

Prepared: <u>July 28, 2011</u>

<u>Jackson</u>, Wyoming

1  I.   **OFFER TO PURCHASE** dated <u>July 28, 2011</u> _____ from

**Paul Ronci**

**Caryn Ronci**

2  ("Buyer"), to

**Michael V. Defelice**

3  ("Seller"). Subject to the provisions of this offer, if accepted by Seller, Buyer agrees to buy and Seller agrees to sell the
4  following described real estate situate in the town or city of _____, in the County
5  of __Teton__, Wyoming, commonly known as _____
6  __505 West Saddle Butte Way__
7  and more particularly described as:

**Lot #2, Saddle Butte Ranch Subdivision, according to that plat recorded January 6, 1998 as
Plat No. 920 comprised of 16.56 acres more or less**

8   with all improvements thereon, easements and other appurtenances and all fixtures of a permanent nature currently on the
9   premises except as hereinafter provided, in their present condition, ordinary wear and tear excepted, and including all
10  personal property described herein (hereinafter "Property").
11  II.  **EARNEST MONEY.** Buyer delivers $ 5,000.00 _____ in the form of
12  __wire transfer to closing agent__
13  to Broker working with the Buyer, __Janine Bay Teske, JH Real Estate Associates__ (Selling
14  Brokerage Firm Name),
15  (select one):
16  ☐ herewith, which Broker working with the Buyer acknowledges having received, or
    ☑ no later than __72__ hours after mutual acceptance hereof (said funds to be delivered to Listing Brokerage
17  Firm or Closing Agent by the close of the next banking day from receipt of Buyer (if funds are sent directly to Closing
18  Agent, Broker working with Buyer shall send notice to Listing Brokerage Firm concurrent with such transfer)). Listing
19  Brokerage Firm, __Jackson Hole Real Estate Associates__ shall deposit such funds (in its
20  trust account) or (in an appropriate trust account with
21  __Jackson Hole Title and Escrow__ as Closing Agent). The deposit by Listing
22  Brokerage Firm shall be completed by the close of the next banking day following its receipt from Broker working with the
23  Buyer, or from Buyer, and shall retain such funds in such account. If the earnest money deposit is not received as
24  described in this section, this contract shall be void. Listing Brokerage Firm or Closing Agent shall not disburse such
25  deposit until funds have cleared the bank(s) and, if this offer has been accepted, until closing or until the parties hereto
26  have otherwise agreed in writing regarding disbursement of such funds.
27  III.  **PURCHASE TERMS.** Buyer agrees to buy the above-described property upon the following terms and conditions and for
28  a purchase price of ($ 500,000.00 )
29  __Five Hundred Thousand point Zero Zero__
30  Dollars payable as follows:
31  $ 5,000.00 _____ earnest money deposit; and at least
32  $ _____ by obtaining a new loan (per Section IV A); and/or
33  $ _____ note and mortgage to Seller (see Section XV Additional Provisions for Terms); and/or

WAR Form 320-0411, Contract to Buy and Sell Real Estate (Farm & Ranch) (Vacant Land)
2011© Wyoming Association of REALTORS®
PREPARED BY: Ray Elser, Broker
Realfast, Inc.®, ©2011 Realfast2Go version1.0. Software Registered to: Office Manager, Contour Investment Properties
7/28/2011 4:12:35 PM

Page 1 of 7

Exhibit G

34    $_____ *(other)* _____;

35    $ **495,000.00** _____ (approximate) balance of purchase price to be paid in collected or immediately available

36    funds acceptable to the closing firm.

37   **IV.**   **LOAN TERMS.**

38    A. ~~If a new loan is to be obtained, describe and add special terms, if any. Loan Type-Terms~~

      ~~_____~~

39    ~~Said loan to be amortized for a period of _____ years at an initial interest rate not to exceed _____ %~~

40    ~~per annum resulting in initial □ (monthly) □ (annual) *(select one)* payment of principal and interest of~~

41    ~~approximately $_____ If Buyer agrees to accept and can qualify for terms other than the above,~~

42    ~~the approval of the Seller shall not be required, provided the Seller incurs no additional expense as a result thereof.~~

43   **V.**   **LOAN APPLICATION. If a new loan is to be applied for by Buyer, Buyer agrees to:**

44    ~~A. Complete and tender the loan application to lender within _____ banking days following Seller's acceptance of~~

45    ~~this offer. If applicable, Buyer also agrees to cooperate with lender and complete any required steps in conjunction~~

46    ~~with a credit report and appraisal.~~

      ~~B. Buyer shall provide a loan approval letter by the close of business on _____~~

47    ~~(date). "Approval" means that a firm commitment has been made from a Wyoming licensed mortgage lender broker or~~

48    ~~a person or agency listed in W.S. § 40-23-105 and if necessary accepted by Buyer, for an amount no less than that~~

49    ~~stated in Section III above. Furthermore, the letter must state that the loan has been reviewed and approved and is~~

50    ~~unconditional subject only to appraisal and acceptable title as stated in Section VIII Title, and that the Buyer's cash to~~

51    ~~close has been verified by lender.~~

52    ~~C. Complete and promptly tender to Lender any and all documents and other information required to process the~~

53    ~~application;~~

54    ~~D. Not withdraw the assumption or loan application or intentionally cause any change in circumstances which would~~

55    ~~prejudice such application. Accept the assumption or loan if approved by Lender at above-stated terms and~~

56    ~~conditions.~~

57    ~~E. In the event that Buyer, after having complied with the requirements set forth in Section V, A through D above, fails~~

58    ~~to qualify for such financing and provides Seller with a written letter of declination by Lender, this Contract shall be~~

59    ~~voidable at the option of Buyer or Seller, by sending written notice to Seller within 5 days of Buyer's notice of~~

60    ~~declination by Lender. If voided by Buyer or Seller pursuant to this clause, the earnest money deposit receipted for~~

61    ~~above shall be returned to Buyer subject to the requirements of Section II above and this Contract shall terminate.~~

62   **VI.**   **CLOSING COSTS.**

63    A. Buyer shall pay the following loan and closing costs in cash or certified funds at closing, ~~or on the date specified by~~

64    ~~lender:~~

65      1. ~~Loan origination fee, discount points, credit report, appraisal, inspections and/or certifications;~~

66      2. ~~Any other costs of securing financing;~~

67      3. ~~Any prepaid tax, leases/permits;~~

68      4. Recording fees for warranty deed and mortgage;

69      5. Fees for the title insurance policy as described in Section VIII B below.

70      6. Other:

      **none**

71    B. Seller shall pay the following closing costs in cash or certified funds at closing:

72      1. Recording fee for any mortgage releases, deed preparation, statement of consideration and Owner's title

73      insurance policy as stated in Section VIII B below;

74      2. Other:

      **none**

75    C. Closing fee shall be paid by ☑ (Buyer) ☑ (Seller) *(select applicable)*

76    **in equal shares** _____ .

77    D. General taxes for the year of closing based on the most recent assessment shall be apportioned through date of

78    closing.

79    E. Irrigation assessments will be paid as follows **by Seller, if any.** _____ .

80   **VII.**   **ITEMS INCLUDED IN PURCHASE PRICE.**

81    A. Price shall include all fixtures currently on premises, including but not limited to, ~~all lighting, heating and plumbing~~

82    ~~fixtures; all outdoor plants, air conditioning, ventilating fixtures and evaporative coolers, built-in appliances,~~

83    ~~permanently attached floor coverings, storm windows and doors, screens, garage door openers and controls,~~

84    ~~smoke-fire detection devices, curtain and drapery rods, attached TV antennas, TV satellite dish and controls (if~~

WAR Form 130-0411, Contract to Buy and Sell Real Estate (Farm & Ranch) (Vacant Land)
2011© Wyoming Association of REALTORS®
PREPARED BY: Ray Elzner, Broker
Realfast, Inc ©. ©2011 Realfast2Go version1.0. Software Registered to: Office Manager, Contour Investment Properties
7/28/2011 4:12:35 PM

85 ~~owned by Seller), attached mirrors, awnings, water softeners (if owned by Seller), propane tanks (if owned by Seller),~~
86 ~~heating stove(s) and fireplace inserts, gates, auto gates cattle guards and irrigation-domestic water systems, stock~~
87 ~~tanks (delete items not included): and~~

**none**

88 PROVIDED, HOWEVER, that the following fixtures of a permanent nature are to be EXCLUDED from the sale:

**none**

89 Seller agrees to remove all such excluded fixtures in a workmanlike manner without causing damage to the premises,
90 on or before the date of possession or closing, whichever is sooner. Any such damages shall be repaired at Seller's
91 expense.

92 B. The price shall also include the following personal property items currently on the premises: (Personal property shall
93 be transferred with a sufficient Bill of Sale):

**none**

94 , in the condition as stated in Section X below.

95 C. To include the following mineral rights :

**all of record, if any**

D. To include the following lease, licenses, easements, agreements and permits (surface damage, grazing, water
96 discharge, oil and gas, wind etc.) :

**none**

97 E. To include the following water rights (ground, surface, reservoir, pipeline and stockwater) :

**all of record, if any.**

98 F. To include the following growing crops :

**none**

99 G. The price shall also include any propane or other heating liquid remaining in any tank on the premises on date of
100 closing.

101 VIII. TITLE.

102 A. Title shall be conveyed to the following named Buyer(s):

**Paul Ronci and Caryn Ronci**

103 as ☐ (Sole Owners), ☑ (Husband and Wife), ☐ (Joint Tenants with Rights of Survivorship), ☐ (Tenants in
104 Common), ☐ (LLC), ☐ (Partnership), ☐ (Corporation) ☐ (Trust) *(Buyer select one.)*

105 B. Seller agrees to furnish, at Seller's expense, a current commitment for an Owner's title insurance policy in an amount
106 equal to the purchase price, showing merchantable title in Seller. Seller agrees to deliver the title insurance
107 commitment to Buyer no later than **August 11, 2011** , and deliver the policy to Buyer
108 without unreasonable delay after closing and pay the premium thereon at the time of closing. Buyer, within
109 **14** days of receipt of the title insurance commitment and exceptions, encroachments, covenants, and/or
110 easements identified therein shall identify and provide to Seller, in writing, notice of any title defects which Buyer is
111 requesting be addressed before closing. Buyer shall pay for any Mortgagee's title policy and any endorsements
112 required by Lender or Buyer.

113 C. Title shall be merchantable in Seller. Seller agrees to execute and deliver a general warranty deed, or
114 _____
115 deed, including the release and waiver of all homestead rights, if any, and a good and sufficient bill of sale to Buyer
116 conveying said real and personal properties. Title shall be subject to general taxes for the year of closing, local
117 improvement districts, irrigation ditch right of ways, guaranteed revenues to utility companies, building and zoning
118 regulations, city, county and state subdivision and zoning laws, easements, restrictive covenants, and reservations of
119 record and the following additional encumbrances to include unrecorded easements which shall NOT be released or
120 discharged at closing:

**None**

121 D. Except as stated in Section VIII C above, if title is not merchantable or otherwise recordable and written notice of such
122 defects in title is given by Buyer to Seller or Listing Broker within the time herein provided for delivery of deed and
123 shall not be rendered merchantable within 30 days after such written notice, then this contract, at Buyer's option, may
124 be specifically enforced or may be declared void and of no effect, and each party hereto shall be released from all
125 obligations hereunder and the payments made hereunder shall be thereupon returned forthwith to Buyer; PROVIDED,
126 HOWEVER, that in lieu of correcting such defects, Seller may, within said 30 days, obtain a commitment for Owner's
127 title insurance policy in the amount of the purchase price reflecting title insurance protection in regard to such

WAR Form 320-0411, Contract to Buy and Sell Real Estate (Farm & Ranch) (Vacant Land).
2011© Wyoming Association of REALTORS®
PREPARED BY: Ray Elser, Broker
Realfast, Inc®, ©2011 RealfastQGo version1.0, Software Registered to: Office Manager, Cantron Investment Properties
7/29/2011 4:12:35 PM

Page 3 of 7